IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE COUNCIL ROCK SCHOOL          :
DISTRICT                         :        CIVIL ACTION
                                 :
        v.                       :
                                 :                        **FILED**
M.W., by and through his         :            4824
parents, Marc W. and             :        NO. 11-3~~X~~64        JUL 2 6 2012
Barbie W.                        :
                                                        MICHAEL E. KUNZ, Clerk
                                                        By_____Dep. Clerk

MEMORANDUM

McLaughlin, J.                                        July 24, 2012

At issue in this case is whether the Council Rock
School District ("the District") provided M.W., a student with
disabilities, with a free, appropriate public education ("FAPE")
as required by the Individuals with Disabilities Education Act
("the IDEA").

After a due process hearing, a Hearing Officer
determined that the District denied a FAPE to M.W. and awarded
partial reimbursement for M.W.'s private school tuition for two
years.  The District filed this suit claiming that a FAPE was
provided and no tuition reimbursement should be awarded.  Through
his parents ("the Parents"), M.W. counterclaimed for the full
tuition amount and attorneys' fees.  The parties filed cross-
motions for judgement on the administrative record.

Under the IDEA, this Court conducts a modified de novo
review of the administrative record.  Giving the appropriate
deference to the Hearing Officers's factual findings and having

reviewed the complete administrative record, the Court finds that
a FAPE was denied, that the parent's placement was appropriate,
and that the tuition award was appropriate.  The Court will
therefore grant in part and deny in part both parties' motions.

I.    The Administrative Record

        M.W. is an eighth-grade student who resides with his
parents and two siblings.  M.W. has 22Q Deletion Syndrome, also
known as Velocariofacial Syndrome, a chromosomal abnormality
characterized by multiple physical and brain atypicalities.  M.W.
attended public school in the Council Rock School District, with
placement in special education support classes, from kindergarten
until sixth grade.

        A.    M.W.'s Behavioral Needs

        Among the symptoms of M.W.'s 22Q Deletion Syndrom are
behavioral issues.  The Parents claim that during the 2008/09
school year, M.W. began experiencing both new and more severe
behavioral problems in addition to those he had previously
displayed.  The Parents allege that the District did not
adequately address these problems in the Individual Education
Program ("IEP") offered for M.W.

        The District acknowledges that M.W. had some on-going
behavioral needs stemming from his disability, but argues that
the programming developed for M.W.'s needs kept any behavioral

2

problems from interfering with his academic progress, and that
the school was not aware of new issues arising at home.

      1.   <u>M.W.'s Behavioral Needs Prior to 2009</u>

The District was aware of M.W.'s behavioral symptoms
prior to 2009, particularly anxiety and related inappropriate
social behaviors.  <u>See</u> Exs. P-11[1] (2005 District Evaluation
Report listing "inappropriate social behavior" as a past
presenting behavior and reporting that M.W.'s "social skills,
anxiety and developmental days are interfering with his ability
to make progress in his current setting"); SD-4 (2006 District
Evaluation containing testing reports that include a report of
"high anxiety expressed in repetitive questioning," significant
weaknesses in "self-direction," and recommends "emotional
control"); SD-5 (May 2007 Reevaluation report documenting
"unacceptable" behaviors such as laughing "when he was stressed
out from fear"); P-9 (November 2007 District Reevaluation Report
reporting laugher as a regular reaction from stress and fear and
a plan for when M.W. feels stressed out in the classroom).

M.W. was in a small, socially controlled class with
other special needs students for most of his schooling.

---

[1] The Parents' exhibits from the due process hearing are
designated P-# and the School Districts are designated SD-#.

3

2.   Behavioral Problems in 2008/09

During his sixth grade year, the 2008/09 school year,
M.W., along with four other students, was taught by Patricia
Millen in an autistic support classroom.  Two classroom aides
also provided assistance.  Due Process Hr'g Tr. ("Hr'g Tr.") at
1087, 1092.

In early 2009, M.W. began displaying new and escalating
behavioral problems, including anxiety, tantrums, stealing, and
engaging in inappropriate or sexual communications with students
of the opposite sex.  Id. 135-36; 754-55; 773-74.  Some of these
behaviors occurred at school and M.W.'s parents learned of them
from the school, such as instances of stealing and M.W.'s intense
interest in a girl at school.  Id. 758.  Other behavior, such as
tantrums and meltdowns, occurred at home.  Id. 759-60.

M.W.'s teacher, Ms. Millen, was aware of some
behavioral problems M.W. was experiencing in early 2009, although
M.W. did not have tantrums or scream in school.  Tantrums
likewise did not occur with Ms. Lieberman, M.W.'s science
teacher, or Ms. Krusen, his speech therapist.  Id. 1636, 1654,
1020.  Ms. Millen was also aware of one instance of sexually
inappropriate behavior in Hebrew School.  Id. 1110-11; 1194-95.

In February and March of 2009, Ms. Millen and M.W.'s
mother exchanged a series of e-mails about M.W.  Exs. P-7, SD-20.
In early February of 2009, M.W.'s mother wrote that M.W. has

4

"been coming home crying & throwing tantrums (unrelated to school) . . . he tells me that things have been going on with [another student]. . . . I have been having a lot of issues at home these past few weeks, have you noticed anything different?" Ex. SD-20.  Later in February, she wrote, "wondering if we could set up a meeting with myself, you & my behavioral therapist to see if m[.] is doing ok . . . . We are having issues @ home & just want to make sure everything is ok during the school day." Ex. P-7.

Ms. Millen wrote in February that "Lately M[.] has been doing more tattling and we are also hearing he is saying mean things to the other boys."  In March, Ms. Millen wrote, "I know we have all be working to help resolve the 'newer' issues pertaining to M[.]"  She then reports that M.W. had stolen some books and other papers.  She continues, "[h]e did tell me he hates school because it is too hard.  As far as the other behaviors, as we discussed, most of them gain negative attention for him, which to him is better than no attention. I know you said you were taking him to the psychiatrist, I really hope he opens up about these issues so we can help him."  Ex. P-7.

Later in the e-mail chain, after M.W.'s mother reports that she found another stolen book, Ms. Millen writes,  "M[.] should probably be seen by your psychiatrist as soon as you can make an apt. His behavior is extremely worrisome to me."  Ex. P-

5

7.   M.W.'s mother requested that he be able to speak to a school therapist or psychologist and was told the psychologist does not do individual therapy but a behavioral therapist would be brought in.   Id.   A school behavioral analyst was in M.W.'s classroom several times a week to work with other students, but was only consulted about M.W.'s behavior during that year on two occasions.   Hr'g Tr. at 1122, 1706, 1760-61.

   B.   The IEP's

        In May of 2009, the District offered an IEP for the 2009/10 years for M.W.   Ex. SD-17.   The IEP does not specifically address socialization outside of M.W.'s self-contained class or provide a behavior plan.   On the new behavioral problems, it says that "Recently M[.] was seeking attention in inappropriate manner; deliberately doing things incorrectly or taking things that did not belong to him.   This behavior has abated in the last weeks."

        The IEP includes some social support plans.   For example, the list of "Needs" includes "Focus and attention" and "aprropriate [sic] peer interactions."   Under "Program Modifications and Specially Designed Instruction" the IEP lists "reminders for appropriate peer interactions" to occur in "all school settings" and twice weekly "[d]irect, explicit, sequential instruction in social skills using social cuing, prompting, role play, and/or social scripting" in "special education classroom."

6

Ex. SD-17.

      The Parents rejected this IEP.  Ex. SD-23.

      At the time of the IEP, the Parents had privately commissioned a neuropsychological exam from Dr. Edward Moss.  The report is undated and the parties dispute when the Parents obtained the report, although they had a copy by the summer of 2009.  Ex. P-1.

      In July of 2009, the Parents informed the District that they were placing M.W. in The Quaker School at Horsham, a private school.  M.W. continues to attend the Quaker School.

      The Parents first requested a due process hearing in January of 2010.  That complaint was withdrawn to allow the school to review Dr. Moss's report and possibly issue a reevaluation report.  M.W.'s IEP team met with the Parents and by telephone with Dr. Moss in April of 2010.  The District issued a reevaluation report on May 7, 2010, stating that no additional information was needed at that time.  Ex. P-8.  The District continued to offer the 2009 IEP as the IEP for M.W., claiming that it met M.W.'s needs and Dr. Moss's recommendations.  Hr'g Tr. 1853-54; Ex. SD-28.

      The Parents filed another due process complaint on June 23, 2010, seeking tuition reimbursement for the 2009/10 and 2010/11 school years.  Young Ltr. 6/23/10.

      After the complaint was filed, in July of 2010, the

District requested permission to reevaluate M.W. so it could draft a new IEP to address M.W.'s needs.  Exs. SD-26; S-25.  The Parents did not grant permission and the request was not pursued while the parties engaged in this litigation.

     C.    The Due Process Hearing

     A due process hearing was held before Hearing Officer Jake McElligott on July 29, September 16, December 17, 2010 and February 11, 16, 24, and March 24, 2011.  Both parties were represented by counsel.

     M.W.'s parents both testified at the hearing and the Parent's called Dr. Edward Moss, a neuropsychologst; and Ruth Joray, head of the Quaker School.  In addition, Keri Guster, M.W.'s therapist at Progressions; Debra Croyden, a seventh-grade teacher at the District; Sarah Krusen, M.W.'s speech therapist at the District; Nicole Lieberman, M.W.'s sixth grade teacher at the District; Scott Helsinger, the behavior analyst assigned to M.W.'s District classroom; and Kasey Black, a District school psychologist, testified.  Both parties submitted exhibits.

     The Hearing Officer issued his findings of fact and decision on May 3, 2011.

     D.    The Hearing Officer's Findings of Fact and Decision

     The Hearing Officer found that M.W. was denied a FAPE for the 2009/10 and 2010/11 school years, that the Quaker School

was an appropriate placement for M.W., and that the Parents were
entitled to reimbursement of fifty percent of the tuition at the
Quaker School for the 2009/10 year and full tuition for the
2010/11 year.  See Decision at 16-17.

The Hearing Officer delineated his findings of fact in
thirty-two numbered paragraphs.  These findings include:

> 5.   . . . Beginning in January 2009, however, the
>      student began to exhibit significant acting-out
>      behaviors in school and at home. (NT at 750-751,
>      753, 755). . . .
>
> 6.   Over February and March 2009, the student related
>      problems with a peer, began to focus inordinate
>      attention on a second peer, stole items from a
>      teacher, stole papers belonging to a second
>      teacher, and exhibited problematic behaviors at
>      home. (P-7; S-20; NT at 753, 758-774);
>
> 11.  The May 7th IEP did not address the acting-out
>      behaviors that surfaced in the winter and spring
>      of 2009, or the long-prevalent problematic school
>      behaviors and anxiety which had been identified by
>      the District over the course of years. (P-6, P-9,
>      P-10, P-11; S-4, S-5). . . .
>
> 17.  At some point between June 12, 2009 and August 4,
>      2009, parents received their expert's evaluation
>      report. In a letter dated July 23, 2009, parents
>      informed the District that it intended to place
>      the student privately at District expense.
>      Parents did not include copies of either of the
>      expert reports referenced in their July 23[rd]
>      letter. (S-23; NT at 579-580, 801-803).
>
> 18.  In response to this communication from parents,
>      the district responded that it needed parents'
>      consent to contact the experts and enclosed
>      releases to allow the District to contact the
>      experts.  These releases were not returned by
>      parents. (S-23; NT at 274-276).
>
> 19.  The student was enrolled at the private placement
>      on August 4, 2009. (NT at 788-789). . . .
>
> 23.  [At the private placement, the] student receives
>      individualized adaptions and instruction. (P-21;
>      NT at 582-587,591-92, 595-600).
>
> 24.  The program at the private placement is

> appropriate for the student. (P-21, 9-27, P-28; NT
> at 557-742).

Id. at 4-8.

The Hearing Officer also wrote a six page "Discussion and Conclusion of Law." Citing to his findings of fact, the Hearing Officer found that the "IEP of May 7, 2009 does not address [the student's] needs in a way that is reasonably calculated to yield meaningful education benefit." Id. at 11.

He explained that two factors "especially highlight this denial of FAPE." First, he compared the District's restrictive programming for M.W. with the testimony of District witnesses that M.W. "[p]resented no significant behavioral challenges." Id. The Hearing Officer concluded that "[b]ased on the demeanor and non-verbal communications of the teachers and speech/language therapist . . . the District witnesses minimized, at the hearing, the challenges the student presented." Id. at 11-12. Second, the Hearing Officer noted that M.W.'s teachers were aware of multiple instances of behavior changes in early 2009, but the District "pursued no evaluation process, behavior analysis, or change in programming." Id. at 12.

The Hearing Officer also found that the private placement at the Quaker School was appropriate and conducted a balancing of the equities to find that the Parent's recovery for the 2009/10 school year should be reduced because the Parents did not share the 2009 report prepared by Dr. Moss or sign releases

10

requested by the District in July 2009 to enable the district to talk to the Parent's experts.  Id. at 13-14.

## II.  Analysis

Under the IDEA, states receiving federal public-education funding are required to provide a free, appropriate public education ("FAPE") to children with a disability.[2]  20 U.S.C. § 1412(a)(1); Mary Courtney T. v. Sch. Dist., 575 F.3d 235, 240 (3d Cir. 2009).  A FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."  Bd. of Educ. v. Rowley, 458 U.S. 176, 188-89 (1982).

This entitlement is ensured through the creation of an Individual Education Program ("IEP").  An IEP is a written document developed for each student.  The IEP must be "reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential."  Shore Reg'l High Sch. Bd. of Ed. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004) (internal quotations omitted).  By law, it must

---

[2] In addition to requiring a FAPE, the IDEA requires that education be provided in "the least restrictive environment." 20 U.S.C. § 1412(a)(5)(A).  The least restrictive environment is the one that provides the disabled child with a satisfactory education together with children who are not disabled.  S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 265 (3d Cir. 2003).  This provision is not at issue in this case.

include several elements, including a statement of the student's "present levels of academic achievement and functional performance," a statement of "measurable annual goals," a description of the progress towards those goals, and a list of the supplementary aids, services, and individual accommodations provided to the student.  20 U.S.C. § 1414(d)(1)(A).  "[I]n the case of a child whose behavior impedes the child's learning," the IEP team shall "consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior."  Id. § 1414(d)(3)(B)(I).  The adequacy of an IEP is calculated as of the time it is offered to the student.  Fhurmann v. East Hanover Bd. of Ed., 993 F.2d 1031, 1040 (3d Cir. 1993).

The educational benefit provided by the school through the IEP must be more than de minimis; it must be "meaningful." Polk v. Central Susquehanna Intermediate Unit 16, 853 F.2d 171, 182 (3d Cir. 1988).  A district does not have to provide "the optimal level of services," so long as a "basic floor of opportunity" is made available.  D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 557 (3d Cir. 2010) (citations omitted).  There is no bright line rule to determine whether a student is receiving a meaningful educational benefit.  Id. at 568.  Instead, courts look at all of the factors relevant to that student's educational potential.

"Parents who believe that a public school is not

12

providing a FAPE may unilaterally remove their disabled child from that school, place him or her in another school, and seek tuition reimbursement for the cost of the alternate placement." Mary Courtney T., 575 F.3d at 242.  The initial determination of whether the school has provided a FAPE is made at a due process hearing.  34 C.F.R. § 300.507; 22 Pa. Code § 14.162; S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 240 (3d Cir. 2003).  Any party aggrieved by the findings and decision in the due process hearing has the right to bring a civil action in state or federal court.  1415(g)(1); Carlisle Area School v. Scott P., 62 F.3d 520, 527 (3d Cir. 1995).

Parents may be entitled to tuition reimbursement of private school placement if the school district failed to provide a FAPE and the placement was proper under the IDEA.  Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993).

A.   District Court Review of an IDEA Claim

When there is a challenge under the IDEA, a district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C § 1415(i)(2)(C).  The party bringing the civil action, that is, the party challenging the Hearing Officer's determination, bears the burden of proving its case as

13

to the claims it brings.  See Ridley Sch. Dist. v. M.R., ___ F.3d ___, No. 11-1447, 2012 WL 1739709, at *7 (3d Cir. May 17, 2012)

A district court reviewing an IDEA claim does so under a "modified de novo" standard.  S.H., 336 F.3d at 270.  The district court must give "due weight to the underlying administrative proceedings."  Id.

If the district court does not consider evidence outside of the administrative record, any conclusions contrary to the hearing officer's must be supported in the record and "the court must explain why it does not accept" the hearing officer's findings of fact.  Id.  Factual findings from the administrative proceedings are to be considered prima facie correct.  Id.  The court should "defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion."  Id. (quoting Carlisle, 62 F.3d at 529).

Judicial review is "by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.

Legal conclusions by the hearing officer are not entitled to deference.  N.M. v. Cent. York Sch. Dist., No. 09-969, 2010 U.S. Dist. LEXIS 124148, at *13 (M.D. Pa. 2010).

14

B.   Evidentiary Rules at the Due Process Hearing

Neither the Federal Rules of Evidence nor the
Pennsylvania Rules of Evidence strictly apply at the due process
hearing.  Tr. Oral Arg. Jan. 26, 2012 at 28.  At the hearing,
each party is entitled to "present evidence and confront, cross-
examine, and compel the attendance of witnesses" and to
"[p]rohibit the introduction of any evidence at the hearing that
has not been disclosed to that party at least five business days
before the hearing."  300.512(a)(2)-(3).

The enacting Pennsylvania regulation says that
"[a]lthough technical rules of evidence will not be followed, the
decision shall be based solely upon the substantial evidence
presented at the hearing."  22 Pa. Code. § 14.162(f).
Pennsylvania has created a Special Education Dispute Resolution
Manual, which references some evidentiary issues, but does not
provide the substantive rules of evidence that govern the
hearing.  See Pa. Special Educ. Dispute Resolution Manual, Office
for Dispute Resolution (2009 Ed.), available at
http://odr-pa.org/wordpress/wp-content
/uploads/SEDR-man.pdf.

C.   The Parties' Challenges Under the IDEA

The plaintiff asks this Court to find that a FAPE was
provided for M.W. for the 2009/10 and 2010/11 school years, that
the private school placement at the Quaker School was

15

inappropriate, and that the Parents were not entitled to any tuition reimbursement for the private school placement.   The plaintiff also argues that the Hearing Officer improperly admitted evidence which was inadmissible.

The Parents ask this Court to find that a FAPE was denied for the two years, that placement at the Quaker School was appropriate, and that the tuition reimbursement was improperly reduced.   Neither party requested that the Court hear additional evidence.   Instead, the parties jointly requested that the Court rule on motions for judgement on the administrative record.   Tr. Oral Arg. Jan. 26, 2012 at 7.

### 1.   FAPE for 2009/10

The plaintiff argues that the evidence[3] does not support the conclusion that M.W. was denied a FAPE. Particularly, the District argues that it had no information about any new and unaddressed behavioral problems that developed in 2009, and therefore the 2009 IEP adequately addressed M.W.'s behavioral needs, as had the IEP's of prior years.

As described above, the District was aware of M.W.'s

---

[3]As discussed below, the Court concludes that although some questionable evidence was admitted, the Hearing Officer appeared to limit his consideration to evidence that was properly admitted, at least for the purposes for which he considered it. In any event, the Court has ignored some testimony and exhibits, challenged by the plaintiff, that appear to be irrelevant or without a proper foundation.

behavioral needs, particularly his anxiety, prior to 2009.  The

school was also aware of new behavioral issues beginning in 2009.

These included stealing, inappropriate interpersonal

interactions, and tantrums.  None of these behavioral needs were

addressed in the 2009 IEP.

        The question of whether the District adequately

addressed M.W.'s behavioral needs in a way that allowed him to

obtain a meaningful educational benefit is a very close one.  On

the one hand, the evidence presented by the District supports the

District's argument that M.W.'s behavioral issues, including the

new issues arising in 2009, may have been isolated to the home

setting, thus they were adequately addressed in the school

setting with the same programming that had been provided for the

prior years.

        On the other hand, the evidence also shows that the

2009 IEP did not address existing issues such as anxiety, which

Ms. Millen testified was not a problem for M.W., even though it

was documented in numerous reports about M.W.  Hr'g Tr. at 1274.

In addition, the school was aware of new behavioral problems in

early 2009, some of which occurred in school and others that were

reported to the school.  Ms. Millen identified these behaviors as

"new[]" and "worrisome" and counseled M.W.'s mother to seek

psychiatric assistance for M.W.  Ex. P-7.  Despite this, the IEP

for 2009 did not address these issues and there was no behavior

17

management plan in place for M.W, nor was one recommended by his teachers.  Hr'g Tr. at 1101-02.  The school's behavioral analyst was not consulted about M.W. and he did not attend M.W.'s IEP meeting.  Ex. SD-17, SD-22.

Notably, the Hearing Officer concluded that "[b]ased on the demeanor and non-verbal communications of the teachers and speech/language therapist as each testified about, specifically, the student's behavioral needs and anxiety, it is the considered opinion of this hearing officer that the District witnesses minimized, at the hearing, the challenges the student presented." Decision at 11-12.  Neither the "non-testimonial, extrinsic evidence" or the "record read in its entirety" supports disagreeing with the presumptively correct factual finding of the Hearing Officer.

Considering the evidence described, the deference given to the Hearing Officer, and the burden of proof in this case, the Court concludes that the District has not shown that a FAPE was provided to M.W.  Thus, the Court finds that the 2009 IEP denied M.W. a FAPE for 2009/10.

2.    FAPE for 2010/11

The District argues for the first time here that it was under no obligation to offer an IEP to M.W. for 2010/11 because the Parents had unilaterally placed M.W. in the Quaker School and had not requested a re-evaluation or another offer of FAPE.

Because the Parents rejected the 2009 IEP as not constituting a
FAPE and were then entitled to place M.W. privately and then
bring suit for tuition reimbursement, the District was not
relived of its obligation to provide a FAPE in 2010, as it
attempted to do through the 2010 IEP.

In 2010, the District continued to offer the 2009 IEP.
Ex. SD-28. The Parents again rejected this IEP and retained M.W.
in private placement. Because the same IEP was offered in 2010
as in 2009, the Court finds that a FAPE was also denied for the
2010/11 school year.

### 3. Appropriateness of The Quaker School

The District argues that the Quaker School was not an
appropriate placement for M.W. because it did not meet his needs.
A private school placement does not need to meet the IDEA
standard applied to public schools. Florence Cnty. Sch. Dist.
Four v. Carter, 510 U.S. 7, 12-13 (1993). A placement is proper
if it "provides significant learning and confers meaningful
benefits." Lauren W. Ex rel. Jean W. V. DeFlaminis, 480 F.3d
259, 276 (3d Cir. 2007) (internal quotations omitted).

The District argues that M.W. was not appropriately
assessed upon entering the Quaker School; no individualized
subject matter programs were created for him; no behavior plan
was created; the school did not have experience with students
with 22Q Deletion Syndrome; the teachers were not certified in

19

special education; and related services such as speech and
language therapy, social skills instruction, occupational
therapy, and access to a certified behavior analyst or school
psychologist were not available.

The evidence does not support these arguments.  The
Quaker School assessed M.W. when he was admitted and had a copy
of Dr. Moss's evaluation.  Hr'g Tr. at 558.  The school had
taught students with similar needs as M.W.  Id. 580-81.  The
school is designed to provide individualized academic instruction
to each student, with six to seven students in each classroom,
and curriculum includes social skills and behavioral and
emotional programming.  Id. 566-68; 573-74; 583-84; 704.  There
were counselors available to M.W., occupational therapy was
incorporated into the classroom, and a behavioral plan for M.W.
was created in conjunction with Ms. Guster.  Id. 597; 696; 701-
02; see also Exs. P-21, P-27, P-28.  In addition, there was
evidence presented that M.W. made both academic and emotional
progress at the Quaker School, including a reduction in his
medication in response to decreased anxiety.  P-1; P-28; Hr'g Tr.
at 194-200; 593-94.

The Court finds that the Quaker School is an
appropriate placement.

### 4.   Evidence Admitted and Considered

The District argues that the Hearing Officer improperly

20

admitted and considered the following evidence:

- the testimony of Dr. Moss, the Parent's expert, who produced a report for the Parents in 2009;

- the testimony of Ms. Guster, a behavior support consultant from a private institution, Progressions, who worked with M.W. in 2009, and records from Progressions;

- the testimony of Ms. Joray, head of the Quaker School, and records from the Quaker School;

- a DVD video of M.W. engaging in a tantrum at home in June of 2009; and

- a letter report created by Dr. Tornea in May 2010 and a report created by Dr. Pipen in 2009.

The District argues that all of this evidence is irrelevant to whether the District provided a FAPE to M.W because this evidence describes behavioral problems that occurred outside of the school and was not provided to the District.  The District also argues that Dr. Moss's and Ms. Guster's testimony was inadmissible because it was not credible.

### a.   Dr. Moss

The District argues that the Hearing Officer erred in admitting Dr. Moss's testimony and evaluation report, Exhibit P-1.  Generally, the District's arguments address the weight the that should be given to Dr. Moss's testimony, not its admissibility.  For example, the District's arguments that Dr. Moss never observed M.W. in a school setting; that he was aware that the Parents were considering private school placement for

21

M.W.; that his discussion of the characteristics of those who
have 22Q deletion syndrome generally did not match M.W.'s
symptoms; and that other treatment providers reached different
conclusions about M.W.'s risk profile, all go to the
persuasiveness of his conclusions.

The District also argues that Dr. Moss's testimony and
report are inadmissible because they address issues unknown to
the District at the time the 2009 IEP was created.  The
plaintiff's objection on this point has some merit.  A
substantial amount of evidence came into the hearing about M.W.'s
behavior outside of school, including testimony from Dr. Moss.
There was no evidence that the school district knew about much of
this behavior, at least before the 2009 IEP.  But the Hearing
Officer did not rely on this evidence in his findings of fact.
He relied on the specific documentary evidence of the school
district's knowledge and his credibility determination that the
school witnesses minimized the student's behavioral needs.  The
school district did have Dr. Moss's report, moreover, when it
offered the 2010 IEP in this case.

The District also argues that Dr. Moss's report is not
credible, because he violated ethical rules by not reporting that
Mrs. W. and M.W.'s questionnaire responses on which he based
conclusions should be examined cautiously and he used outdated
tests for some of his analysis.  Dr. Moss's report did say that

22

caution should be used in considering M.W.'s self-reporting.  Ex.
P-1 at 5; Hr'g Tr. at 547.  Dr. Moss agreed during cross
examination at the hearing that he used a subpart of a test that
had been revised and was no longer valid, and should have stated
that in his report.  Hr'g Tr. at 523-24.  He explained that the
outdated tests were only two of the seventy he administered, were
properly labeled in the report, used for the purpose of a
clinical diagnosis, and not determinative of his findings.  Id.
at 546.  Mrs. Black, the District's psychologist who helped
create the IEP for 2010, critiqued Dr. Moss's methodology and
conclusions on additional grounds.  Id. at 1902-17.

        The Court concludes that none of these critiques rise
to the level of a methodological flaw that would exclude Dr.
Moss's testimony under the Daubert standard.  The use of two
correctly identified, although out-dated tests, do not undermine
the methodology or general acceptance of Dr. Moss's approach or
conclusions.  Mrs. Black's critique, coming from a non-expert
witness testifying to the reason she chose not to rely on his
report in adopting the 2009 IEP for M.W., does not undermine his
credentials, methodology, or conclusions to the extent they
should be excluded from evidence as a matter of law.

        The District also argues that Dr. Moss was permitted to
testify beyond his area of expertise, particularly on
recommendations of school programming.  There was some testimony

of Dr. Moss that went beyond his expertise and even beyond the
limits placed on his testimony by the Hearing Officer; but again,
the District does not appear to have been prejudiced by this
testimony.  And the Court has considered Dr. Moss's testimony
only to the extent it relates to his expertise: 22Q deletion
syndrome, neuropsychology, and clinical psychology.

> b.   Ms. Guster and the Progressions Records

The District argues that Ms. Guster's testimony
and the Progressions records documenting her out-of-school
behavioral therapy with M.W. should not have been admitted
because Ms. Guster's interactions with M.W. occurred outside of
school and the records were not shared with the District prior to
the hearing.  The plaintiff also argues that the records and
testimony are not credible because Ms. Guster is unqualified to
offer an opinion on school programming or implementation of a
functional behavior plan.  Finally, the District objects to Ms.
Guster's testimony that she was involved in creating a behavioral
plan for the Quaker School, because this evidence shows that the
Quaker School did not prepare its own behavioral plan for M.W.
and was not an appropriate placement.

Ms. Guster interacted with M.W. regularly during the
relevant time period.  Her testimony, including the fact that her
notes show that many of M.W.'s behavioral problems were occurring
at home, and her participation in IEP meetings are relevant to

24

the contested issue of the school's knowledge of M.W.'s behavioral needs.  The Hearing Officer did not treat Ms. Guster as an expert in educational programming.  Hr'g Tr. at 1381.  The Hearing Officer did not rely on Ms. Guster's testimony or the Progression exhibits to conclude that the school district was aware of M.W.'s behavioral problems.  See Decision at 5-6.  It does not appear that the Hearing Officer relied on any information about M.W.'s behavior that was not supplied to the school district.  Thus, the Hearing Officer gave the testimony its due weight.  In addition, Ms. Guster's testimony about her participation in developing programming for the Quaker School are relevant to the determination of the appropriateness of that placement.

### c.   Ms. Joray and the Quaker School Records

The District argues that Ms. Joray's testimony was irrelevant and that she lacked personal knowledge for some of her testimony.  The Court does not agree.  When the District objected to Ms. Joray's testimony on grounds of personal knowledge, a foundation was laid.  In addition, her testimony was relevant to determining whether the Quaker School is an appropriate placement for M.W.  Arguments that Ms. Joray contradicted herself in cross-examination and minimized the behavior problems M.W. experienced at the Quaker School go generally to Ms. Joray's credibility, but not to the admissibility of her testimony.

25

d.    The Drs. Pippen and Tornea Reports

The reports by Drs. Pipen and Tornea, Exhibits P-3 and P-4, are likewise relevant to M.W.'s needs and whether the Quaker School was an appropriate placement, but the Court also notes that the Hearing Officer did not rely on either report in his findings of fact.

e.    The DVD

The District objects to Exhibit P-22, a DVD of M.W. having a tantrum at home, as irrelevant to the behavior displayed in school.  The video was provided as evidence of the problems which arose in 2009.  The District witnesses all viewed it and testified that no similar behaviors were displayed in school.  In addition, the Hearing Officer did not rely upon the video in his findings of fact.

D.    Tuition Award

Both parties find fault with the Hearing Officer's tuition reimbursement award and ask this Court to grant different relief.  The District seeks an order that the Parents are not entitled to any tuition reimbursement.  The Parents counterclaim and seek an award for the full amount of tuition for both years.

If a school district fails to provide a student with a FAPE, the parents can place the student in a private school and obtain tuition reimbursement from the school for the cost of the

26

private education. 20 U.S.C. § 1412(a)(10)(C)(ii). If a FAPE was denied and the placement chosen by the parents was appropriate, then the parents can recover tuition for the cost of the enrollment. Id.; Sch. Comm. Of Town of Burlington v. Dep't of Educ., 471 U.S. 359, 369 (1985).

An award for tuition compensation does not require a showing of bad faith on the part of the school district. M.C. v. Central Regional Sch. Dist., 81 F.3d 389, 396 (3d Cir. 1996); 1412(a)(10)(C). Although parents are permitted to place their children in private school and then sue for reimbursement, they do so at their own risk. "The IDEA was not intended to fund private school tuition for the children of parents who have not first given the public school a good faith opportunity to meet its obligations." C.H. v. Cape Henlopen Sch. Dist., 606 F.3d 59, 72 (3d Cir. 2010).

Statutorily, the IDEA permits the reduction or denial of tuition reimbursement if: 1) if the parents did not inform the school that they were rejecting the IEP proposed by the school; 2) if the parents did not make the child available for a requested reevaluation prior to removal of the student from public school; or 3) "upon an finding of unreasonableness with respect to actions taken by the parents." § 1412(a)(10)(C)(iii). This reasonableness requirement replaced the old "balancing of the equities" test, but courts still refer to a balancing of the

27

equities when applying this statute.  See Forest Grove Sch.
Dist., 557 U.S. 230, 129 S. Ct. 2484, 2496 (2009).

        The primary inquiries in determining a tuition award
are the appropriateness of the IEP and the behavior of the
parents.  Warren G. v. Cumberland Cnty. Sch. Dist., 190 F.3d 80,
86 (1999).  The Court of Appeals has also directed that when
determining a tuition award, "a court or hearing officer . . .
must consider all relevant factors."  C.H., 606 at 72.  These
include, for example, the parent's notice to the school, the
school's ability to evaluate the student, any hindrance by the
parents to IEP meetings and necessary evaluations, and the
appropriate and reasonable level of reimbursement that should be
required.[4]  Id.; Forest Grove, 129 S. Ct. at 2496; Buck Cnty.

---

[4] The Parents argue that their actions can only be deemed
"unreasonable" if they impeded the school's ability to create an
appropriate IEP.  None of the cases they cite for this argument
support that limitation.  For example, in Loren F., the Eleventh
Circuit remanded a case so the district court could determine if
the parents contributed to the FAPE denial and to determine if
the parents acted unreasonably, marking them as separate
inquiries.  Loren F. v. Atlanta Indep. Sch. Sys., 349 F.3d 1309,
1319 (11th Cir. 2003).  None of the courts in other cases cited
by the Parents required a specific type of behavior in order to
find unreasonableness.  See Diaz-Fonseca v. Puerto Rico, 451 F.3d
13, 32 (1st Cir. 2006) (not unreasonable to put student in
private placement given finding of FAPE denial); Regional Sch.
Dist. No. 9 Bd. of Educ. v. Mr. and Mrs. P., No. 06-1278, 2009
U.S. Dist. LEXIS 2176 (D. Conn. Jan 12, 2009) (parents attended
meetings and attempted to work with the school district, so they
didn't act unreasonably); P.K v. New York City Dep't of Educ.,
No. 09-1472, 2011 WL 3625317, at *21 (E.D.N.Y. Aug. 15, 2011)
(rejecting IEP without attempting placement at public school is
not per se unreasonable behavior).

Dept. of Mental Health/Mental Retardation v. Pennsylvania, 379
F.3d 61, 69 (3d Cir. 2004).

In this case, the Hearing Officer found that because a
FAPE had been denied, the Parents were entitled to tuition
reimbursement for the 2009/10 and 2010/11 years.  He also found
that the equities supported a reduction in tuition for the
2009/10 year because the Parents did not share the information
they gathered for their expert, or the expert's report, with the
District.  Decision at 13-14.

Giving due weight to the Hearing Officer's factual
findings, this Court agrees.  The denial of a FAPE for the two
years entitles the Parents to tuition reimbursement.  This
finding is unaffected by whether the school acted in good faith
or adhered to IDEA procedures.  But the Parents' behavior is also
relevant and supports a partial reduction in tuition.  The
Parents did not share their expert report or other information
regarding behavioral programming with the District until after
they decided to reject the May 2009 IEP and place M.W. in a
private school.  By doing so, they did not give the District the
opportunity to provide an IEP that took into account the expert's
findings and recommendations.

E.   Defendant's Claim for Attorney's Fees

The Parents' motion for judgment on the pleadings also
requested attorneys' fees.  The IDEA allows a court to "award

reasonable attorneys' fees" to the "prevailing party who is the parent of a child with a disability."  20 U.S.C. § 1415(i)(B)(i); 34 C.F.R. § 300.517.  The District responded by filing a motion to strike the Parent's request, arguing that the Parents waived their right to recover attorneys' fees by not raising the issue at the due process hearing, that the Parents did not request permission to supplement the administrative record, and that the request is premature and should not be made until after the Court issues a decision and any appeals are resolved.

        The Court has not had the opportunity for a full briefing on this issue.  Therefore, the Court will deny this part of the Parent's motion and deny the District's motion to strike without prejudice to either's arguments.  If they wish to pursue their claim for attorneys' fees, the Parents need to file a motion that can be fully briefed for the Court.

        An appropriate order will issue.